

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

**ENTERED**
**07/27/2015**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **HUMBERTO  SAENZ JR; fdba PIZZA** | § | **CASE NO: 13-70423** |
| **PATRON INC; fdba ESTRELLA** | § | |
| **VENTURES, INC. DBA PIZZA PATRON;** | § | |
| **aka SAENZ; fdba ARMAR ENTERPRISES** | § | |
| **INC,** *et al* | § | |
|     **Debtor(s)** | § | |
| | § | **CHAPTER  7** |
| | § | |
| **JOSE MARIA GOMEZ** | § | |
|     **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 13-07024** |
| | § | |
| **HUMBERTO  SAENZ JR,** *et al* | § | |
|     **Defendant(s)** | § | |

### <u>MEMORANDUM OPINION</u>

Humberto Saenz, Jr. and Estrella Ventures, LLC's actions constitute common law fraud. As a result of Defendants' actions, Plaintiffs Jose Maria Gomez and JMG JMG Ventures, LLC suffered actual damages in the amount of $330,000.  The Court awards Plaintiffs exemplary damages in the amount of $82,500.

The $412,500 award is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

### Procedural Posture

On September 11, 2011, Gomez and JMG JMG Ventures, LLC filed suit against Saenz, Estrella Ventures, and Lone Star Bank in the 381st District Court, Starr County, Texas. Plaintiffs alleged causes of action against Saenz and Estrella Ventures for: (i) fraudulent misrepresentation; (ii) breach of contract; (iii) common law fraud; and (iv) conversion.  On December 4, 2012, Plaintiffs filed a First Amended Original Petition in the Starr County lawsuit

naming IBC and Pizza Patrón, Inc.  Plaintiffs sole cause of action against IBC was common law fraud.

Saenz filed a Chapter 7 bankruptcy petition on August 27, 2013.  (Case No. 13-70423; ECF No. 1).  The lawsuit was removed to bankruptcy court on November 19, 2013.  On November 26, 2013, Plaintiffs commenced an adversary proceeding seeking an exception to discharge under 11 U.S.C. § 523.  (Case No. 13-07029; ECF No. 1).  On that same date, IBC brought its own suit seeking indemnification from Saenz and an exception to discharge.  (Case No. 13-07028; ECF No. 1).

 Pizza Patrón was dismissed from Adversary Proceeding 13-07024 on October 22, 2014.  (ECF No. 33).  Lone Star and IBC filed separate motions for summary judgment on December 15, 2014.  (ECF Nos. 54 and 56).  The Court denied IBC's motion on February 6, 2015.  (ECF No. 74).  On March 5, 2015, the Court issued an order severing all claims against Lone Star into a separate adversary proceeding.  (ECF No. 86).  In the separate adversary proceeding, judgment was issued on June 12, 2015 in favor of Lone Star Bank.  (Case No. 15-07006; ECF No. 10).

In Adversary Proceeding 13-07029, Saenz and Estrella Ventures filed a motion to dismiss on August 26, 2014.  (Case No. 13-07029; ECF No. 23).  At a hearing on January 26, 2015, the Court dismissed Plaintiffs claims under 11 U.S.C. § 523(a)(2)(B).  Plaintiffs were allowed to proceed with their claims under §§ 523(a)(2)(A); 523(a)(4); and 523(a)(6).

On February 17, 2015, the Court held a consolidated trial on Adversary Proceedings 13-07024, 13-07028, and 13-07029.  At the close of Plaintiffs' case in chief, IBC moved for a Judgment on Partial Findings under Fed. R. Civ. P. 52(c).  The Court granted the motion.  Saenz and Estrella Ventures also moved for a Judgment on Partial Findings, and the motion was

granted as to Plaintiffs' claims for conversion and nondischargeability under §§ 523(a)(4) and 523(a)(6).  Following the conclusion of the trial, the Court requested supplemental briefing.

## Background

In the spring of 2009, Gomez approached Saenz to inquire about purchasing a Pizza Patrón franchise location in Rio Grande City, Texas.  (Case No. 13-07029; ECF No. 22 at 3); (*see also* ECF No. 97 at 16) (testimony of Saenz).  Gomez had been introduced to Saenz through Jesús Ortiz, Saenz's brother-in-law and a close friend of Gomez.  (ECF No. 97 at 200).  Ortiz was a manager at a separate Pizza Patrón location.  *Id.* at 256.  Prior to his expressing interest in the Pizza Patrón franchise, Gomez had spent approximately six months looking into purchasing either a Domino's, Little Caesers, or Dairy Queen franchise.  (ECF No. 98 at 147-48).  Ultimately, Gomez settled on Pizza Patrón due to his longstanding relationship with Ortiz.  (ECF No. 97 at 255).  Ortiz told Gomez that Saenz was the corporate representative for Pizza Patrón in the South Texas region.  (ECF No. 98 at 168).  Gomez further testified that Saenz made the same representation several times, a fact which Saenz denies.

On September 7, 2004, Saenz had entered into a Franchise Development Agreement with Pizza Patrón.  (Plaintiffs' Ex. No. 5).  Saenz signed the document in his capacity as President of Estrella Ventures, Inc., a company he had founded for the purpose of operating Pizza Patrón franchises.  The agreement granted Saenz the right to develop Pizza Patrón restaurants within a certain Development Area.  *Id.*  Although the "Development Area" was not defined in the agreement as presented to the Court, Saenz has testified that his territory was from "Starr County, Roma, all the way to Alamo and bordered with the actual Mexican border.  The northern

border was Monte Cristo Street up in Edinburg."[1]  (ECF No. 97 at 55).  Saenz held the exclusive right to develop stores within the region.

Although Saenz's Franchise Agreement with Pizza Patrón for the Rio Grande City location is not before the Court, Plaintiffs have provided copies of a blank Pizza Patrón Franchise Agreement that Saenz provided to Gomez for his review.  The Franchise Agreement unambiguously prohibits voluntary transfers of the franchise without the prior written consent of the Franchisor.  (Plaintiffs' Ex. No. 4 at 19).  "Any transfer lacking the Company's prior written consent . . . will be ineffective against Company and will constitute a default under Section 16(c)(2)."  *Id.*

As of 2009, Saenz owned at least four Pizza Patrón locations.  *Id.* at 81.  To finance the development of these restaurants, Saenz took out three loans from the International Bank of Commerce.  The three loans were cross-collateralized and were secured by blanket liens over accounts receivable, inventory, equipment, furniture, and fixtures for three of the four locations.  (Plaintiffs' Ex. No. 22).  The liens covered the Rio Grande City location as well as two stores in McAllen.  The three loans combined were in the original principal amount of $480,500.00.  *Id.* By November 25, 2009, Saenz owed IBC $335,880.00.  *Id.*

In August of 2009, Gomez and Saenz reached a preliminary agreement for Gomez to purchase the Rio Grande City location for $350,000.00.  Gomez needed financing and requested a Small Business Administration loan from Lone Star National Bank for $287,200.00.[2]  (IBC Ex. No. 8).  In connection with the loan application, Lone Star asked for certain documentation.

---

[1] "Development Area" was defined in a separate Exhibit B to the Development Agreement and was not included in Plaintiffs' Exhibit 5.

[2] The Small Business Act empowers the SBA to "make loans to any qualified small business concern . . . for the purposes of this chapter.  Such financings may be made either directly or in cooperation with banks or other financial institutions. . . ."  15 U.S.C. § 636(a).

Gomez has testified that he called Saenz and requested that he provide a profit and loss statement. (ECF No. 98 at 179). After receiving the request, Saenz testified that he enlisted the help of Elizabeth Gauna, his banker at IBC. (ECF No. 97 at 26). Gauna had known Saenz since 2005, when he first took out a loan from IBC. (ECF No. 98 at 7). Saenz stated that he brought his receipts to Gauna and she showed him where the numbers belonged. (ECF No. 97 at 26-27). Gauna denies that Saenz ever approached her for help with the profit and loss statements. (ECF No. 98 at 46). Even if Gauna provided assistance, however, Saenz testified that he provided all of the numbers and she merely helped with "how to format it." (ECF No. 97 at 125).

According to Saenz, he first met with Guana in August of 2009 to prepare the income statements. (ECF No. 97 at 27). He testified that he told Gauna he needed the income statements in connection with the sale of the Rio Grande City location. (ECF NO. 97 at 51). Saenz claimed he first told Gauna about the potential sale as early as June or July of 2009. (ECF No. 97 at 136). Gauna testified that Saenz never told her about the sale until October 29, 2009. (ECF No. 98 at 30). IBC documents prepared by Gauna shortly after the relevant events corroborate Guana's version of events. Gauna kept an Activity Summary where she logged every contact she made with Saenz regarding his loans. (Plaintiffs' Ex. No. 21). She logged eight contacts with Saenz between June 10, 2009, and October 27, 2009, including two face-to-face meetings. *Id.* The Activity Summary made no mention of any potential sale. It was not until a Special Progress Report dated November 25, 2009, that Gauna noted that Saenz "currently has the Rio Grande Pizza Patrón location for sale. . . ." (IBC Ex. No. 17). Gauna clarified that although she wrote this report on November 25, he had actually informed her of the sale on October 29. (ECF No. 98 at 38).

A credit memorandum issued by Lone Star indicates that by August 18, 2009, Lone Star had received an interim profit and loss statement for the Rio Grande City location through June 2009 (the "June income statement").  (IBC Ex. No. 9).  The June income statement indicated that from January 1, 2009, through June 30, 2009, the Rio Grande City location generated net sales of $243,414.00.  (IBC Ex. No. 2).  Subtracting the cost of goods sold of $74,496.00 and operating expenses of $85,911.55, the income statement reported net income of $83,006.45.  *Id.*  Mr. Gomez could not specifically recall whether he had seen this income statement.  (ECF No. 97 at 268).

Saenz also provided to Gomez an income statement from January 1 to September 30, 2009 (the "September income statement").  (Plaintiffs Ex. No. 6).  Gomez testified that he saw this document sometime in mid-October of 2009 and provided it to Lone Star.  The September income statement listed total sales of $338,924.00 and net income of $107,505.16.  The cost of goods sold was listed as $102,593.00 with operating expenses of $128,434.84.

The accuracy of the June and September income statements can be called into question after examining several other pieces of documentary evidence.  First, Saenz also prepared an income statement through October 31, 2009, which was provided to Lone Star at some point.[3] Gomez testified that he "probably" saw this document.  (ECF No. 97 at 269).  The October income statement list net income of $121,919.14, but more notably indicates that the cost of goods sold was $102,593.00.  (IBC Ex. No. 6).  This is the exact same cost of goods sold contained in the September income statement.  Unless the Rio Grande City location received free ingredients for the month of October, it would be impossible for these numbers to be identical.

Another apparent discrepancy with the income statements can be found in the Net Sales Report for Store 55 (the Rio Grande location) provided by Pizza Patrón.  The sales report records

---

[3] The document is marked with a Lone Star National Bank Bates stamp.  (IBC Ex. No. 6).

all sales that ran through the cash register on a given day, excluding merchandise and phone cards. (ECF No. 97 at 37). From January 1, 2009, through September 30, 2009, the Rio Grande City location generated $254,635.32 in net sales. (Plaintiffs' Ex. No. 15). The Net Sales Report lists sales which are $84,288.68 less than the $338,924.00 listed in the September income statement. The Net Sales Report lists sales of $173,937.80 through June 30, 2009. This is $69,476.20 less than the June income statement.

Finally, Saenz has also provided tax returns for Estrella Ventures. In 2006, Estrella Venture's income tax return for the Rio Grande City location showed net sales of $431,127.00. After deducting $152,352.00 for the cost of goods sold and $251,318.00 in other various deductions, Estrella Ventures reported $27,457.00 in ordinary business income for 2006. (Plaintiffs' Ex. No. 12). The deductions included $17,264.00 in interest payments and $24,798.00 in depreciation. Saenz did not include the interest and depreciation expenses in the income statements that he provided to Gomez.[4] Even adding these amounts back in to ordinary business income, plus $1,703.00 in claimed amortization, the Rio Grande City location only made $71,222.00 in 2006. Using the same calculations, the store made only $59,116.00 in 2007.[5] (Plaintiffs' Ex. No. 13). Yet in the September income statement, Saenz claimed the store was on pace to make approximately $134,381.45 for the 2009 calendar year, more than twice what he reported in 2007.

Lone Star also requested that Gomez provide a Certification of No Change or Non-Material Change. Saenz has testified that, although he is not entirely sure what the document means, it is a requirement in order to obtain an SBA loan. (ECF No. 97 at 55). At some point,

---

[4] Depreciation is not a true cash expense, and Gomez has testified he understood that the income statements did not include loan servicing expenses.

[5] This figure does not include $5,000.00 in expendable start up expenses claimed in Statement 1.

Lone Star received a Certification of No Change dated November 10, 2009 and signed by Charlotte Hargrove as authorized representative for Pizza Patrón, Inc. (Plaintiffs' Ex. No. 10). Both Gomez and Saenz deny sending the document. However, in 2005, Saenz had previously received a Certification of No Change in connection with his original purchase of the Rio Grande City franchise.[6] The document was dated April 7, 2005 and was also signed by Charlotte Hargrove as authorized representative for Pizza Patrón, Inc. (Plaintiffs' Ex. No. 7). As shown below, it is readily apparent the 2009 Certification of No Change is forged from the 2005 Certification of No Change with only the date being altered.



The documents even share the same copying imperfections in the "v" and "r" of Hargrove and the "I" of Inc.

On October 15, 2009, Gomez and Estrella Ventures entered into a Purchase-Sale Agreement. (Plaintiffs' Ex. No. 1). Saenz signed the document as President of Estrella Ventures. Estrella Ventures agreed to sell all equipment and inventory for the Rio Grande City

---

[6] Saenz testified that he gave the document to Gomez as an example of what a Certification of No Change should look like.

location for $350,000.  It further agreed to transfer the lease and franchise in exchange for a $9,000 transfer fee.  Gomez never paid a $9,000 fee beyond the $350,000 purchase price, as he understood the $350,000 price to include the transfer fee.  (ECF No. 97 at 261-62).  It appears that Saenz never asked for the additional $9,000.  Both Saenz and Gomez testified that they did not feel they had signed a binding contract at that point.  Saenz stated that "[i]t wasn't approved yet. . . .  They could have backed out.  He could have backed out anytime."  (ECF No. 97 at 98-99).  When asked if he felt committed to purchasing the restaurant after signing the Purchase-Sale Agreement, Gomez also stated that he could have backed out at any time.  (ECF No. 97 at 189).  Neither Gomez nor Saenz obtained written consent from Pizza Patrón approving the potential transfer.

*Saenz's Response to the Sale*

After the change in ownership, Saenz had a problem.  The store needed to continue making royalty payments to Pizza Patrón, but Saenz had never told Pizza Patrón about the transfer.  Pizza Patrón would inevitably be suspicious if the royalties suddenly came from an account associated with Gomez.  To solve this dilemma, Saenz asked Gomez for his account number at Lone Star so Saenz could send the money to Pizza Patrón.  (ECF No. 98 at 201); (ECF No. 97 at 147).  Gomez agreed, and Saenz faxed an authorization form to Pizza Patrón which contained Gomez's account number.  (Plaintiffs' Ex. No. 24).  On the cover sheet, Saenz wrote "Attn: Charlotte . . . Change for Store #55 Rio Grande City Drafting.  I need to change my acct. because existing bank is returning some items."  *Id.*  Saenz has admitted this was a lie.  (ECF No. 97 at 148).  He stated he lied to Pizza Patrón because he "wasn't ready" for it to find about the sale of the store to Gomez.  *Id.* at 110.

Under the terms of the Purchase-Sale Agreement, Saenz was to receive $350,000 from the sale of the restaurant's equipment and inventory. Saenz testified that he received all but $20,000 of the purchase price. (ECF No. 97 at 82). On February 26, 2010, Saenz met again with Elizabeth Gauna. (IBC Ex. No. 18). At the February 26 meeting, Saenz informed her that he had recently closed on the sale of the Rio Grande City location. (IBC Ex. No. 18). In her progress report—also dated February 26, 2010—Gauna noted that the sales proceeds totaled $150,000. *Id.* After paying down the loan on the store, Guana allowed Saenz to keep the supposed (i.e., assuming that the actual sales price was only $150,000 rather than $350,000) remaining balance of $66,777.00. In the same progress report, Gauna noted in a November 25, 2009, entry that Saenz informed her he had located a buyer for the Rio Grande City store at $150,000. The November 25 entry also stated that Saenz "is currently working for Pizza Patrón corporate.

Saenz testified that he never misrepresented to IBC the amount of the sale and that he gave Gauna a copy of the purchase agreement. (ECF No. 97 at 131). Gauna testified that she only found that the purchase price was actually $350,000 a few weeks before the trial. (ECF No. 98 at 68). She stated that she should not have relied on Saenz's word and regrets not asking for a copy of the purchase agreement. *Id.* Due to the cross-collateralized nature of Saenz's loans with IBC, she testified that if she had known the true amount of the purchase price, she would have paid off the two remaining loans. Ultimately, Saenz defaulted on the two remaining loans and IBC lost approximately $200,000. *Id.* at 77.

*Gomez Takes Over the Restaurant*

Gomez's SBA loan from Lone Star closed on February 8, 2010. (ECF No. 97 at 189). Gomez took possession of the store on March 10 or 11, 2010. *Id.* Prior to the change in

management, Pizza Patrón corporate representatives had conducted numerous walkthroughs of the Rio Grande City location and given the store a numerical grade.  On April 17, 2007, the store received 95 out of a possible 100 points.  (Plaintiffs' Ex. No. 19 at 1).  On December 28, 2007, the store received 77 out of 100.  *Id.* at 5.  By June 4, 2009, the score had dipped all the way to 33 out of 100 points.  *Id.* at 12.  Although the score had improved marginally to 58 out of 100 on September 2, 2009, there can be no doubt that the scores improved during Gomez's tenure.  For the June 19, 2010, evaluation, the store received a grade of 84.4%.[7]  (Plaintiffs' Ex. No. 20 at 1).  On August 12, 2010, the store received a 94.4% grade.  *Id.* at 7.  Finally, for the fourth quarter inspection (the date is illegible), the store received an 88.1% grade.  Saenz admitted that Gomez, or at least Gomez's employees, were doing a good job of running the store.  (ECF No. 97 at 93).

The parties agree that Gomez did not personally attend the inspections that occurred while he was running the restaurant.  They do not agree as to the reason.  Saenz testified that he merely warned Gomez that Gomez needed to be in uniform during the inspections or Pizza Patrón would dock points, and that Gomez chose not to attend.  (ECF No. 97 at 81-82).  Gomez alleges that Saenz informed him that franchise owners could not attend the inspections, and that Saenz would attend in his stead.  (Case No. 13-07029; ECF No. 22 at 5).

In addition to his absence from corporate inspections, Gomez also alleges that Saenz discouraged him from attending a training session at the Pizza Patrón headquarters in Dallas.  As noted above, Gomez had performed research regarding franchises prior to purchasing the restaurant, and knew that some franchise agreements required owners to undergo training.  (ECF No. 98 at 155).  Indeed, Pizza Patrón's franchise agreement requires the franchisee and the store's general manager to attend training before a store may open for business.  (Plaintiff's Ex.

---

[7] Pizza Patrón switched to a different scoring system for the 2010 evaluations.  The scores were now out of 108 possible points and included a category of "Critical Points."  For the sake of simplicity, the Court will only refer to the percentage score given.

No. 4 at 6).  However, Gomez testified that Saenz told him that so long as Gomez had a certified assistant manager helping him run the store, he did not need to attend training right away.  (ECF No. 98 at 154).  He testified further that he still wanted to attend training, and would periodically ask Saenz to send him to training.  *Id.* at 197.  Saenz would apparently keep putting him off and tell him to ask again in a couple of months.[8]

Saenz's recollection differs significantly.  He claimed that he and Gomez reached a "gentleman's agreement" that Gomez would need to attend the franchise training before the franchise would officially transfer.  (ECF No. 97 at 68).  Gomez was simply unwilling or unable to make the training.  *Id.* at 75.  Saenz testified that he entered into a similar transaction in 2011, when he sold a different Pizza Patrón franchise and only informed Pizza Patrón of the sale after the fact.  *Id.* at 73.  The purchaser in that case only attended the training after the sale had closed.  Saenz admitted that the alleged gentleman's agreement contradicts the terms of the Purchase-Sale Agreement.

Gomez operated the store from March 10 or 11, 2010, to March 8, 2011.  During that time, he continued to work full time at a separate job until 5 p.m., at which point he would come to the restaurant and work until 11.  (ECF No. 98 at 194).  In October or November of 2010, Gomez learned that he had developed an abnormality within his eye and that the heat of the kitchens would exacerbate his condition.  *Id.* at 195.  Because Gomez only has one eye, the doctor told him to spend less time in the kitchens to avoid further stress to his eye.  Gomez admitted his health concerns played a small role in his decision to close the store, but maintained that his primary concern was that he was not making money.  *Id.*

---

[8] This is not to say Gomez never attended training of any sorts.  He testified that, prior to purchasing the Rio Grande City restaurant, he trained in how to make pizzas and how to operate the cash register at several of Saenz's other Pizza Patrón locations.  (ECF No. 97 at 233).  This informal training lasted several days.

*Gomez Ceases Operation of the Rio Grande City Location*

Despite the improving franchise scores, the actual net sales of the restaurant were in decline. From December 1, 2008, to December 1, 2009, the Rio Grande City location generated $342,543.19 in net sales. (Plaintiffs' Ex. No. 15). The next year, over the same period, it generated only $302,901.02. (Plaintiffs' Ex. No. 16). Gomez testified that he decided not to renew his lease and shut the doors of the restaurant on March 11, 2011.[9] By that point, he testified that he had already lost approximately $70,000 on the year. (ECF No. 97 at 246). He called Saenz, who allegedly told him that he had found a new tenant for the building. *Id.* at 243. Gomez then gave the keys to Saenz, who came with a trailer and moved out all of the restaurant's equipment. *Id.* at 242. Saenz delivered the equipment to Lone Star, who put it up for auction. *Id.*

On March 11, 2011, Saenz received an email from Rikk Grant, project manager at Pizza Patrón corporate. (Plaintiff's Ex. No. 26). The email recounted a conversation Saenz had with Grant and another Pizza Patrón employee. Grant stated that Saenz had informed him on March 8 the Rio Grande City store closed on March 7 because of a failure in the roof structure. Saenz then said the store would reopen on March 10. Grant reminded Saenz to send pictures of the damage, as promised, and inquired as to the progress of the repairs. Saenz responded to Grant's email on March 11, 2011, by stating that he originally closed the store to do roof repairs but then decided to replace the flooring as well. He further stated that "I had all my equip from downtown, so I changed out make line, mixer, ovens and some tables. . . . I ran a trial run yesterday with newer equip and opened up by 11 am today. It was like opening a new store with new flooring and newer equip. . . . I lost about 3 and a half days but well worth it."

---

[9] Gomez is likely mistaken about the exact date. Both Saenz's testimony as well as the Net Sales Report indicate the restaurant was closed from March 8, 2011, to March 10, 2011. (Plaintiffs' Ex. No 17).

In only three-and-a-half days, Saenz cleared out all of Gomez's equipment and installed brand new equipment in the store.  Saenz was unable to corroborate his testimony that the roof of the store was caving and needed repairs.  He could not recall who he hired to help him with the repairs.  (ECF No. 97 at 118-19).  Saenz never informed Pizza Patrón the true reason why the store had closed or why the equipment needed to be replaced.  Without obtaining permission from Gomez, the ostensible franchise owner, Saenz reopened the store for business under the Pizza Patrón name.

Saenz could not halt the decline in sales.  From December 1, 2010, to December 1, 2011, (during which time period both Gomez and Saenz operated the restaurant) net sales totaled only $236,359.16, a decrease of $66,541.86 from the previous year.  (Plaintiffs' Ex. No. 17).  Sales did not improve in 2012.  On October 8, 2012, Saenz abandoned or sold the restaurant and another company took over operations.  (ECF No. 97 at 94).

## Findings of Fact

Although the parties generally agree on the chronology of events, Saenz's testimony differs from that of Gomez and Gauna in several key respects.  The Court must decide which version of events to believe.

Gomez's testimony was generally credible.  Although he occasionally confused certain dates and misunderstood several questions, he answered questions directly and without hesitation.  Gomez has some experience in business and financial matters.  He has a bachelor's degree in elementary education and built and operated two car washes for approximately 25 years.  (ECF No. 97 at 219-20).  In addition, in 2000 or 2001 he subdivided and sold 23 lots in seller-financed transactions.  As a somewhat experienced businessman, his actions would make

little sense if the Court accepted Saenz's testimony. Gomez's version of events is much more plausible.

In ruling on IBC's Rule 52(c) motion, the Court found Elizabeth Gauna's testimony to be credible. Her testimony was fully supported by the documentary evidence. She readily admitted when she could not remember certain details, and provided credible testimony as to what she could remember. There were no discrepancies in her testimony. Perhaps most importantly, Gauna provided testimony that was against her own interest. Gauna stated that she regretted not verifying the purchase price of the Rio Grande City Restaurant and that her mistake potentially cost IBC a great deal of money.

Saenz, by contrast, lied frequently whenever it suited him. Saenz admitted that he lied to Pizza Patrón about why he sent them an authorization to withdraw money from Gomez's bank account at Lone Star. He then lied again to Pizza Patrón about why the Rio Grande City location was closed from March 8, 2011, to March 11, 2011. He also lied to IBC when he informed Gauna that he sold the restaurant for only $150,000.00. Saenz's explanation that he told Gauna the correct purchase price, showed her the purchase agreement—which conspicuously says $350,000.00 in the first sentence—and that she mistakenly wrote down $150,000.00 is wholly implausible. As the Court noted on the record during trial, "[t]he case is full of lies by Mr. Saenz." (ECF No. 98 at 124). The Court places little weight on Saenz's testimony.

Keeping in mind the credibility of the witnesses as well as the available documentary evidence, the Court must decide two key factual disputes. The first dispute is whether the September income statement was false. Although it is not entirely clear whether Gomez saw this document before he signed the purchase agreement on October 15, 2009, that dispute is largely irrelevant. Both Saenz and Gomez have testified they felt the purchase agreement was non-

binding.   Indeed, Saenz went so far as testify that he himself has backed out of a purchase agreement after signing it.  (ECF No. 97 at 99).  It is undisputed that Gomez saw the September income statement well before his loan closed on February 8, 2010, and he took over the store the following month.  Gomez has further testified that he relied on the September income statement in deciding to go ahead with the purchase.  He knew that he would be paying at least $55,000.00 per year to service his debt to Lone Star.  (ECF No. 97 at 198).  If he could not make enough money to make his loan payments and have "some money to work with," he would not have purchased the store.  *Id.*

Saenz has provided several explanations for why the net sales he listed in the September income statement are $84,288.68 higher than the net sales reports obtained from Pizza Patrón for the same time period.  His first explanation is that Pizza Patrón's reports would not include the rental income he received through two subleases.  Saenz provided a statement to Lone Star claiming that Estrella Ventures received $27,600.00 in rent from a Sprint store and a party supply store in 2008.[10]  (IBC Ex. No. 3).  Because Saenz did not pay royalties to Pizza Patrón on his rental income, the rent would not have been reported in Pizza Patrón's sales report.  Saenz testified that he transferred these subleases to Gomez during the purchase.  Gomez did not dispute this.  Accordingly, the Court accepts Saenz's contention that a portion of the discrepancy can be explained by rental income.

This still leaves a discrepancy of $56,688.68.   Saenz's second explanation for the inconsistency is that Pizza Patrón went through several programs where at times they would sell calling cards to Mexico, t-shirts, and cups.  (ECF No. 97 at 43).  According to Saenz, franchisors

---

[10] Gomez testified that Saenz would have only received $18-19,000 in rent through September 30, 2009.  (ECF No. 97 at 238).  Prorating this estimate for an entire year comes out to approximately $22,500-$23,750.  The Court has never received an explanation for this discrepancy.  In any event, the difference is not material.

would not have to pay royalties on these specialty items, but only on pizza.  Because the Pizza Patrón sales report only tracked sales on which royalties were paid, the Rio Grande City restaurant would have extra revenue that would not show up on the Pizza Patrón reports.  This explanation is problematic for several reasons.  Most importantly, Gomez denies that the store even sold t-shirts or cups.[11]  (ECF No. 97 at 189).  Gomez testified that they *did* sell t-shirts for the 2010 World Cup in South Africa, but that was only in the summer months of 2010.  *Id.* at 190.  Apart from that limited circumstance, Gomez stated that there were no t-shirt or cup sales.

A second problem with Saenz's explanation is that if Pizza Patrón itself dictated that its franchises sell certain merchandise, it is curious that it would not expect to receive royalty payments.  Would Pizza Patrón really allow its franchises to sell cups with a Pizza Patrón logo, for example, and then waive royalty payments?  The text of Pizza Patrón's actual franchise agreement indicates that it would not.  The 2012 Franchise Agreement states that "Franchisee agrees to pay Company continuing royalties equal to 5% of Gross Sales."  (Plaintiffs' Ex. No. 6 at 16).  Gross Sales is then defined as "the aggregate revenues the Store receives from the sale of . . . food, beverages, other menu items *and other merchandise*."  *Id.* at 43.  Finally, Saenz has provided no receipts or records to document how much revenue he received from these supposed merchandise sales.  The Court does not accept Saenz's second explanation for the discrepancy in the September income statement.

Saenz's final explanation for the discrepancy is that while he operated the store he routinely took between $800 to $1,000 out of the cash register as his personal income.  (ECF No. 97 at 28).  He testified that because he paid his mortgage and vendors in cash, he needed the cash from the restaurant to pay his bills.  *Id.* at 31.  Previously, he paid his vendors via check, but

---

[11] When asked whether Pizza Patrón sold cups while he owned the store, the transcript states Gomez replied, "no, we did sell shirts or cups as Mr. Saenz had said."  The transcript is in error.  After review of the audio recording, it is clear that Gomez said, "no, we *didn't* sell shirts or cups. . . ."

because he did not deposit the cash from his stores daily, his checking account was frequently overdrawn.  *Id.*  Saenz switched to cash payments to avoid the fees for an overdrawn account. He admits, however, that he kept no records of the cash he took out of the register.[12]  *Id.* at 29.  If he kept no records of the cash withdrawals, it raises the question of how exactly Saenz came up with the numbers listed on the September income statement.

Taken together, the evidence indicates that the September income statement provided to Gomez was false.  The income statement did not match Pizza Patrón's net sales report for the same time period, even accounting for the additional revenue stemming from the subleases.  As discussed above, the income statement also indicated that the Rio Grande City location was more than twice as profitable in 2009 as it had been in 2006 and 2007, a fact particularly hard to believe because of the steep drop in sales in 2010 and 2011.  In addition, the October income statement listed the exact same figure for the cost of goods sold as the September income statement, a blatant error.  Finally, Saenz testified that the income statements included the cash he took from the register, despite admitting that he kept no records of exactly how much he was taking.  The Court finds that the September income statement was false and did not reflect the true financial condition of the store.

The second key factual dispute is whether Saenz represented to Gomez that he was an employee of Pizza Patrón corporate and further that Saenz intended to conceal any sale of the restaurant from Pizza Patrón.  Saenz has denied he ever told Gomez that he was the corporate representative for the South Texas region.  (ECF No. 97 at 20).  Gomez testified that Saenz told him "several times" that he was the corporate representative for the Southern region and seemed

---

[12] Saenz would keep records of cash payments to vendors, which he relied on when preparing the income statement. (ECF No. 97 at 170-71).  His testimony indicates that he would not keep track of the total amount he took out.

to be quite proud of that fact.[13]   (ECF No. 97 at 200).   If Saenz's testimony is true, however, then the actions of both Gomez and Saenz make little sense.   By contrast, if Gomez's testimony is correct, then the actions of both parties are much easier to understand.

Due to his general research into franchises before he decided to purchase a Pizza Patrón franchise, Gomez knew that he needed the franchisor's consent in order to obtain a franchise. (ECF No. 98 at 149).   He then placed calls to Dairy Queen and Little Caeser's but was told they did not have any franchises available.   Gomez called Pizza Patrón to ask about a franchise in Roma, Texas, but cannot remember the substance of the conversation.   After calling Pizza Patrón, he visited his friend Jesús Ortiz, who managed a separate Pizza Patrón location.   (ECF No. 97 at 255-56).   Ortiz told him it would be easier to get a franchise if he went through Saenz rather than calling the Pizza Patrón offices in Dallas because Saenz was the regional director of the South Texas region.   *Id.*   According to Gomez, he then called Saenz, who confirmed that Saenz was in fact the owner of the southern region.   *Id.* at 258-59.   At this point, Saenz apparently only claimed he had a region where he held the exclusive right to develop Pizza

---

[13] Gomez interrupted his counsel's question.   Counsel asked "[d]id Mr. Saenz ever tell you that he was a Pizza Patrón…" to which Gomez answered "yes."   However, the full context of the exchange indicates that counsel attempted to ask if Saenz ever represented he worked for Pizza Patrón corporate.

> Q: Until March 11th of 2011, when you turned the keys into the landlord, did you ever speak with a Pizza Patrón Corporate representative?
>
> A: The only one that I spoke to was Mr. Saenz.   I believed he was a corporate executive.
>
> Q: Why?
>
> A: Because his brother-in-law had told me that he was in charge and had the region—the Southern region. . . . [The brother-in-law] had been a friend of mine all my life and he told me that it would be easier to go through Mr. Saenz because he represented Pizza Patrón in the Southern region. . . .
>
> Q: Did Mr. Saenz ever tell you that he was a Pizza Patrón. . . .
>
> A: Yes, he told me several times.   He was very proud of it.

Gomez also confirmed that Saenz represented himself as a member of Pizza Patrón corporate later in the trial.   (ECF No. 98 at 167-69).

Patrón franchises.  (ECF No. 97 at 259).  This was an accurate statement.  However, Gomez has testified that Saenz later told him Saenz was "part of Pizza Patrón" (explicitly referring to the corporate entity) and that he was very proud of it.  (ECF No. 98 at 167-69); (ECF No. 97 at 200).

The documentary evidence also indicates that Saenz held himself out as a corporate employee.  In the November 25, 2009, IBC progress report, Elizabeth Gauna noted that "Saenz is currently working for Pizza Patrón corporate and is doing all the leasehold improvements for all the future Pizza Patrón's in South Texas."  (IBC Ex. No. 17).  Gauna also testified that Saenz told her he was an employee of Pizza Patrón corporate.  (ECF No. 98 at 31).  As with the discrepancy over the amount of the sale proceeds, Saenz claims that Gauna either misheard or misunderstood him.  He testified that he did tell Gauna he was performing construction work for other franchises, but never told her that he was a corporate employee.  (ECF No. 97 at 22).

Two credible witnesses have testified that Saenz told them he worked for Pizza Patrón corporate. In addition, if Saenz held himself out as a corporate representative, it would explain why Gomez never called Pizza Patrón in Dallas to confirm the transfer of the franchise.  From his perspective, Saenz *was* Pizza Patrón.  Gomez understood that Pizza Patrón had given its consent to the transfer through Saenz.  However, Saenz's conduct makes clear that he never had any intention to transfer the franchise in accordance with the transfer requirements imposed by Pizza Patrón.

Saenz continuously put off Gomez's request to go to Dallas to get training.  His explanation that the franchise transfer would only occur after Gomez completed the training and that Gomez simply couldn't be bothered to do it makes no sense.  Apart from contradicting the plain language of the purchase agreement, it is extremely difficult to fathom that someone would spend approximately $350,000.00 with the specific intent of purchasing a *franchise*, work in the

restaurant six hours every day after working at a full time job, but then neglect for a full year to complete the training necessary for the actual franchise transfer. Instead, it is far more plausible that Saenz purported to transfer the franchise when the deal closed and subsequently dissuaded Gomez from attending the training in order to keep Gomez away from Pizza Patrón corporate employees. It would have raised significant questions had Gomez, ostensibly a new franchise owner, arrived in Dallas when Saenz had not even informed Pizza Patrón he was looking for a buyer. Saenz himself has admitted that he was not ready to answer such questions. (ECF No. 97 at 110).

Saenz then lied to Charlotte Hargrave at Pizza Patrón about why it needed to deduct royalty payments out of Gomez's account at Lone Star. He did this not only to conceal the sale from Pizza Patrón but also to convince Gomez that the franchise had been transferred with Pizza Patrón's approval. Gomez gave his account number to Saenz so that Saenz could set up the withdrawals with Pizza Patrón corporate. (ECF NO. 98 at 202). Each week, Gomez could see that money was withdrawn from his account and that the withdrawals were marked "Pizza Patr." *Id.* at 205. It would be reasonable for Gomez to assume that Pizza Patrón approved of the transfer after he gave his banking information to a supposed representative of Pizza Patrón and shortly thereafter Pizza Patrón began taking money out of his account.

Saenz also provided a forged Certification of No Change in order to convince Gomez that the sale had the blessing of Pizza Patrón while at the same time concealing any hint of a sale from Pizza Patrón.[14] Gomez needed a Certification of No Change before his SBA loan from

---

[14] Saenz argues that the Court cannot determine a document is forged without expert testimony. The Court rejects this argument. The trier of fact's role is to weigh the credibility of witnesses and to resolve evidentiary conflicts. *United States v. Clifford*, 704 F.2d 86, 90 (3d Cir. 1983). The Federal Rules of Evidence contemplate that a trier of fact may compare a handwriting sample with an authenticated sample to determine whether it is genuine *without* the help of expert testimony. Fed. R. Evid. 901(b)(3). Here, Saenz authenticated the 2005 Certification of No Change by testifying that it was genuine per Fed. R. Evid. 901(b)(1). Rule 901(b)(3) then allows the Court, as the trier of fact, to compare the 2009 Certification of No Change with the authenticated 2005 Certification. *See Clifford*, 704

Lone Star would be approved.  Saenz had in his possession a Certification dated April 7, 2005, which he received from Charlotte Hargrove when he originally purchased the Rio Grande City restaurant.  According to Saenz, he merely provided the original to Gomez and he has no idea how a forged copy ended up in the possession of Lone Star.  But Gomez had no motive to forge a document from Pizza Patrón (and to risk his $350,000 investment) when he could have simply asked it to provide him a Certification.  Saenz, on the other hand, has already admitted that he was trying to keep the sale a secret and lied to Pizza Patrón twice to accomplish his goal.  Given that Saenz possessed the original Certification, had a motive to commit the forgery, and lied to Pizza Patrón on two other occasions to conceal Gomez's purchase of the restaurant, the Court finds that Saenz forged the Certification of No Change.[15]

Saenz also kept Gomez away from Pizza Patrón by telling him that he could not be present during the franchise inspections.  Saenz's claim that Gomez could not be bothered to attend the franchise inspections rings just as hollow here as it did when applied to Gomez's

---

F.2d at 90 n. 5 ("[A] jury can compare a known handwriting sample with another sample to determine if the handwriting in the latter sample is genuine."); *Ibrahim v. Gov't of Virgin Islands*, 2005 WL 3077601 at *8 n. 5 (D.V.I. Nov. 3, 2005) ("[H]andwriting expert testimony is not a necessary requisite to a forgery conviction, and such analysis may be left to the jury. . . ."). Saenz has cited a Texas state case where the court declined to make a forgery determination without expert testimony. *Champion v. Robinson*, 392 S.W.3d 118, 127 n. 14 (Tex. App.—Texarkana 2012, pet. denied).  However, the Federal Rules of Evidence are procedural and are generally applicable to federal courts adjudicating state law causes of action. *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993).  In any event, the Texas Rules of Evidence are functionally identical to the Federal Rules on this issue.  Tex. R. Evid. 901(b)(3).  *See also In re Estate of Price*, 2006 WL 3725542 at *2 (Tex. App.—San Antonio Dec. 20, 2006, pet. denied) ("While expert testimony is not required to prove the validity of a signature, there must be some proof of forgery.").

[15] Saenz argues further that the other instances where he lied to Pizza Patrón constitute prior bad acts and cannot be used as a basis to conclude that he forged the document.  Fed. R. Evid. 404(b) provides that "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, such evidence may be admitted in order to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Saenz's separate incidents of lying to Pizza Patrón are not being considered to demonstrate his character, but rather to show a motive and a plan.  Forging the Certification of No Change, changing the bank account under false pretenses, and claiming that he closed the restaurant in order to make roof repairs were all part of his common scheme or plan to conceal the sale of the restaurant from Pizza Patrón. *See United States v. LeCompte*, 99 F.3d 274, 278 (8th Cir. 1996) (stating that evidence of prior bad acts may be admissible to demonstrate a common scheme of similar crimes).  Moreover, these are not instances of *prior* bad acts; they are instances of *contemporaneous* bad acts in furtherance of Saenz's scheme to defraud.

failure to attend franchise training in Dallas.  Gomez's testimony that he worked in the restaurant most nights from 5 p.m. until 11 has not been challenged.  It does not make sense that Gomez would be willing to put in the hours to run his restaurant but not want to be present when his restaurant was inspected.  As with Saenz's previous instances of deception, his actions were calculated to keep Gomez from interacting with Pizza Patrón employees.

By ensuring that Gomez never contacted anyone at Pizza Patrón, Saenz was able to resume operation of the store only three days after Gomez ceased operations.  Had Pizza Patrón actually learned of the sale, it could have ratified the franchise transfer to Gomez.  Saenz testified that he had sold another of his restaurants in 2011 and did not inform Pizza Patrón until after the fact.  (ECF No. 97 at 73).  At some point after the sale, Saenz told Pizza Patrón and they approved the transfer.  Presumably, Saenz could have done the same for Gomez.  Once Gomez shut the restaurant down, however, Saenz was able to restart his Pizza Patrón franchise *without* paying or obtaining permission from Gomez, the ostensible franchisee.

In order to accomplish this, it would have been critical for Gomez to view Saenz as part of Pizza Patrón corporate.  As noted above, Gomez had a fair amount of business experience and had conducted some research into franchises.  He knew that he needed the consent of the franchisor.  (ECF No. 98 at 166-67).  If Saenz held himself out as part of Pizza Patrón, then Gomez would not need to contact other Pizza Patrón officials.  As Gomez stated, "Mr. Saenz was part of Pizza Patrón, the way I understood it, the way he told me.  So, when he sold it to me, it went with consent."  *Id.* at 167.  Saenz's plan to keep the sale a secret would not have worked if Gomez reached out to Pizza Patrón for its approval.  The Court finds that Saenz represented to Gomez that he was an employee of Pizza Patrón corporate.

**Analysis**

Plaintiffs allege the following causes of action against Saenz and Estrella Ventures: (i) fraudulent misrepresentation; (ii) breach of contract; (iii) common law fraud; and (iv) exception from discharge under § 523(a)(2)(A).  The Court will address these causes of action in turn.

*Fraudulent Misrepresentation/Fraud*

Although Plaintiffs pleaded fraudulent misrepresentation and fraud as separate causes of action, fraudulent misrepresentation is actually subsumed as an element of fraud.  *Corral-Lerma v. Border Demolition & Envtl. Inc.*, 2015 WL 2265082 at *2 n. 3 (Tex. App.—El Paso May 13, 2015, no pet.) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)).  To recover for fraud, Plaintiffs must show: (i) that a material representation was made; (ii) that it was false; (iii) that the speaker knew it was false when it was made or that the speaker made it recklessly without knowledge of the truth; (iv) that he made it with the intention that it be acted upon by the other party; (v) that Plaintiffs acted in reliance upon it; and (vi) damages.  *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977).

The Court has found that Saenz made two misrepresentations to Gomez prior to the sale of the restaurant.  Specifically, Saenz provided to Gomez the false September income statement and held himself out as an employee of Pizza Patrón corporate.  There is no dispute that Saenz knew the representation that he worked for Pizza Patrón to be false.  Even assuming that Saenz was not aware the September income statement was false, it was made with reckless disregard.  He admitted to not keeping receipts of his cash withdrawals yet including them as revenue for the purposes of the income statement.  This should have raised serious questions as to the overall accuracy of the income statements he provided.  Both representations were made with the intent to induce Gomez into completing the transaction.

Gomez has testified that he relied on both representations.  With regards to the income statement, he testified that he would be paying $55,000.00 per year in debt service to Lone Star. The September income statement showed that the store had made $107,505.16 in profit through September 30, 2009.  Based on these numbers, Gomez felt that purchasing the restaurant would be a good deal.  Had Saenz shown him the true financial condition of the restaurant, Gomez would have backed out of the deal because he needed to make his loan payments and have "some money to work with" left over.  (ECF No. 97 at 198).  Gomez has also testified that he would not have purchased the restaurant had he known that Saenz did not work for Pizza Patrón corporate. Prior to contacting Saenz, he had already tried to purchase a franchise from Pizza Patrón's main office and had been unsuccessful.  (ECF No. 98 at 218).  Due to his previous failure, it was important to Gomez that he conduct business with someone who had the authority to give him a franchise.  Gomez testified that "[a]t that time, that's what I was looking for authorization." *Id.*

In a fraud case, reliance must be reasonable and justified.  *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  The question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication.  *1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.— Houston [14th Dist.] 2005, rev. denied).  Saenz's has challenged the reasonableness of Gomez's reliance on the September income statement due to his failure to consult with an accountant or attorney.  In his previous business ventures, Gomez had utilized an accountant, but he did not ask his accountant to review any of the numbers provided by Saenz.  (ECF No. 97 at 227).  Gomez also did not have an attorney representing him during the process and admitted to not "pestering" Saenz about the restaurant's financials.  *Id.* at 235.  But Gomez was not an unsophisticated party who did not understand basic financial concepts.  He had experience in business matters.

Relying on his own financial acumen for the simple $350,000.00 purchase of a restaurant is not unjustifiable.  And while it is true that Gomez might have discovered the falsity of the income statement had he "pestered" Gomez, this is no defense to fraud.  "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."  Restatement (Second) of Torts § 540 (1977).  Gomez's reliance on the false income statement was justifiable.

Saenz also challenges Gomez's reliance on Saenz's representation that he was an employee of Pizza Patrón corporate.  Saenz's status as a Pizza Patrón employee was crucial to Gomez because he failed to obtain a franchise from the main Pizza Patrón offices.  However, counsel for Saenz questioned whether Pizza Patrón declined to offer Gomez a franchise simply because Saenz held the exclusive right to develop within that area.  If Pizza Patrón had told Gomez that he simply needed to get Saenz's approval because it was Saenz's territory, then Gomez should have known that Saenz did not represent Pizza Patrón.  However, Gomez repeatedly testified that he did not recall the substance of his conversation with Pizza Patrón, only that they could not help him obtain a franchise.  (ECF No. 98 at 223).  There is simply no evidence that Pizza Patrón told Gomez that Saenz merely controlled the right to develop franchises within an area.  Gomez has testified that both Ortiz and Saenz told him that Saenz was employed by Pizza Patrón corporate.  He had no reason *not* to believe that Saenz worked for Pizza Patrón.  His reliance was justified.

The plaintiff in a fraud action must prove proximate causation.  *S&I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 856 (Tex. App.—Dallas 2011, no pet.).  The components of proximate cause are cause in fact and foreseeability.  *Id.*  The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the injury would not have occurred.

*W. Investments, Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). An injury is foreseeable if the defendant, as a person of ordinary intelligence and prudence, should have anticipated the dangers his negligent (or fraudulent) act created for others. *First Assembly of God, Inc. v. Tex. Util. Elec. Co.*, 52 S.W.3d 482, 493 (Tex. App.—Dallas 2001, no pet.). A plaintiff need not exclude all probabilities; it is sufficient to prove that the greater probability is that the defendant's conduct was the cause of the harm. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987). There may be more than one proximate cause. *First Assembly*, 52 S.W.3d at 493.

There is no question that Gomez suffered an injury. He purchased the restaurant for $330,000.00, it failed, and he lost his entire investment.[16] Did Saenz's misrepresentations proximately cause Gomez's injury? Gomez requested an income statement from Saenz, who provided him a false one. Had Gomez seen the true numbers, he would not have closed the deal. The September income statement was a substantial factor in causing Gomez's injury, because if Saenz had not provided the false statement, Gomez would never have suffered injury. Furthermore, it was clearly foreseeable that providing a false income statement could induce someone to invest and subsequently lose the investment. The September income statement proximately caused Gomez's injury.

Turning to the misrepresentation regarding Saenz's status with Pizza Patrón, Gomez chose to go into business with Saenz because Saenz could provide him "authorization." Based on his prior research, Gomez knew that he needed authorization from the Franchisor, and Pizza Patrón had turned him down after his first attempt. Saenz's alleged status with the company was a critical factor in deciding to purchase the restaurant. If Gomez was not lead to believe that Saenz worked for Pizza Patrón, he would not have done the deal. The resultant injury was

---

[16] Saenz has testified that Gomez only paid him $330,000.00 of the purchase price by the time Gomez closed the store. (ECF No. 97 at 82). Gomez has not rebutted this testimony.

foreseeable as well.   Foreseeability turns on the relevant circumstances at the time of the misrepresentation.  *See Defterios v. Dallas Bayou Bend, Ltd.*, 350 S.W.3d 659, 668 (Tex. App.— Dallas 2011, pet. denied) (examining the relevant circumstances of a particular transactions to find that the risk of loss was foreseeable).  A person of ordinary intelligence and prudence would surely know that informing a potential buyer of a franchise that you worked for the franchisor and could approve the transaction would be an important factor to the buyer.  At the time Saenz made the representations to Gomez, the economy was in recession and his sales were declining.[17] It was foreseeable that a misrepresentation designed to induce Gomez into purchasing the restaurant could result in injury.  Saenz's representation that he was an employee of Pizza Patrón corporate also proximately caused Gomez's injury.

Defendants Saenz and Estrella Ventures committed fraud.   Plaintiffs suffered actual damages in the amount of $330,000.00.  Plaintiffs also seek exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code.  "Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery results from: (1) fraud; (2) malice; or (3) gross negligence."  Tex. Civ. Prac. & Rem. § 41.003.  Plaintiffs are entitled to exemplary damages because they have shown by clear and convincing evidence that the harm inflicted upon them resulted from Defendants' fraud.

"In determining the amount of exemplary damages, the trier of fact shall consider the evidence, if any, relating to: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the

---

[17] The Net Sales Report from December 1, 2008 to December 1, 2009 shows total sales of $342,543.19.  (Plaintiff's Ex. No. 15).  In 2007, Estrella's tax return showed total sales of $424,762.00.  Even accounting for discrepancies caused by the inclusion of rental income and cash withdrawals in the tax return, sales were declining.  A market analysis of Pizza Patrón  prepared by Lone Star dated August 19, 2009, indicates the same: "As we all know, this past summer brought recession, the cyclical trend down in sales, and strong competitor promotions. . . ."

parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant." Tex. Civ. Prac. & Rem. Code § 41.011(a). Exemplary damages function to deter and punish. *Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 804 (5th Cir. 1983). The amount awarded must be reasonably proportional to actual damages, but no set ratio exists for measuring reasonableness. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). Exemplary damages are statutorily capped at the greater of:

(1)(A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

Tex. Civ. Prac. & Rem. Code § 41.011.

The first five factors weigh in favor of awarding exemplary damages. Plaintiffs have shown that Saenz lied repeatedly to Gomez, IBC, and Pizza Patrón throughout the life of the transaction. Saenz was willing to lie whenever it suited him in order to gain an advantage. His conduct offends a public sense of justice and propriety. However, the last factor weighs against a large exemplary damages award. Saenz's bankruptcy schedules indicated assets totaling $196,340.00, or less than Plaintiffs' actual damages. (Case No. 13-70423; ECF No. 1). The Court awards Plaintiffs exemplary damages in the amount of $82,500.00. This sum is equal to one quarter of the actual damages, a conservative figure which should sufficiently punish Defendants and deter future misconduct while keeping in mind their ability to pay. *See Wu v. Rhee (In re Rhee)*, 481 B.R. 880, 893 (Bankr. S.D. Tex. 2012) (awarding plaintiffs exemplary damages equal to 25% of actual damages caused by fraud in a real estate transaction).

Plaintiff has also made a request for its reasonable attorney's fees in bringing this adversary proceeding.  Texas follows the "American Rule," which states that a plaintiff is not allowed to recover attorney's fees in a lawsuit unless authorized by statute or contract.  *S.P. Auto Sales, Inc. v. Benites (In re Benites)*, 2012 WL 4793469 at *9 (Bankr. N.D. Tex. Oct. 9, 2012) (citing *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310–311 (Tex. 2006)).  Attorney's fees are not recoverable for a fraud claim.  *Chapa*, 212 S.W.3d at 304.  Nor is there a contractual provision which would allow for Plaintiffs to recover attorney's fees.  Accordingly, Plaintiffs' request for reasonable attorney's fees is denied.

*Breach of Contract*

The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach.  *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.).  Gomez claims that Defendants breached the purchase agreement by failing to transfer the franchise as agreed. (Plaintiffs' Ex. No. 1) ("It is further agreed that the will be a Transfer Fee for the Lease and Franchise amounting to $9,000 and payable by the Transferee.").  Elements one and three are undisputed: the parties acknowledge the existence of a valid contract and Saenz has testified that the franchise was never transferred.[18]

---

[18] Even if the Court accepts Saenz's testimony that there was an oral agreement that Gomez had to complete training before the franchise transferred, which it does not, the purchase agreement was subject to the statute of frauds.  A contract for the sale of goods valued at more than $500 is subject to the statute of frauds.  Tex. Bus. & Comm. Code § 2.201(a).  The contract in question involved the sale of tangible equipment and inventory for $350,000.00.  Oral modifications of a contract which must be in writing are only allowable so long as the modification does not materially affect the obligations of the underlying agreement.  *See Dracopoulas v. Rachel*, 411 S.W.2d 719, 722 (Tex. 1967).  Because Saenz's alleged modification imposed a material obligation upon Gomez to attend training that was not contained in the written agreement, the oral modification is not enforceable.

There is some dispute whether Gomez performed on the contract. Saenz alleged that Gomez only tendered $330,000.00 of the purchase price and Gomez has admitted that he did not pay a $9,000.00 transfer fee. "It is a well established rule that a party to a contract who is himself in default cannot maintain a suit for its breach." *Dobbins v. Redden,* 785 S.W.2d 377, 378 (Tex. 1990) (citing *Gulf Pipe Line Co. v. Nearen,* 135 Tex. 50, 138 S.W.2d 1065, 1068 (Tex. Com. App. 1940)). However, "one party's breach does not excuse the other's performance unless the breach is material." *Trevino v. HSBC Mortg. Serv., Inc. (In re Trevino)*, 2015 WL 3883180 at *29 (Bankr. S.D. Tex. June 19, 2015) (citing *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 (Tex. 2013). The less the Defendant is deprived of the expected benefit, the less material the breach.[19]  *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 693 (Tex. 1994). Regardless of whether the $9,000.00 transfer fee was in addition to or included in the purchase price, Gomez still paid over 90% of the total price. Any breach by Gomez was non-material.

However, Gomez has not shown that he was damaged as a result of the breach. Although Gomez was not technically the owner of a Pizza Patrón franchise, he was allowed to operate as if he were. Gomez never communicated with anyone associated with Pizza Patrón other than Saenz, but he paid his franchise fees and Pizza Patrón inspected his restaurant per normal procedures. Gomez used the Pizza Patrón mark and sold Pizza Patrón pizzas without interference. He *could* have been damaged when Saenz resumed operating the Pizza Patrón without his permission, but there is no evidence that Gomez ever attempted to stop Saenz from

---

[19] Other relevant factors include: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the breach; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood that the breaching party will cure its breach, taking into account all of the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing. *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 693 n. 2 (Tex. 1994) (citing Restatement (Second) of Contracts § 241 (1981)).

operating without his permission.  Gomez turned over the keys to Saenz, who promptly reopened the store within the week.  Had Gomez gone to Pizza Patrón or Saenz seeking compensation for Saenz's unauthorized actions and been rebuffed, then Gomez would have been damaged by the breach of contract.  There is no evidence that this actually happened.  It appears that Gomez simply abandoned what he thought was his Pizza Patrón franchise.  Accordingly, he has not demonstrated that Defendants caused him damage by breaching the contract.  Plaintiffs have failed to establish by a preponderance of the evidence that Defendants are liable for breach of contract.

*Exception from Discharge*

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud. . . *other than a statement* respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  The operative terms in § 523(a)(2)(A), i.e., false pretenses, false representations, and actual fraud, carry the acquired meaning of terms of art and are common law terms.  *Field v. Mans*, 516 U.S. 59, 69 (1995).  The elements of "actual fraud" under § 523(a)(2)(A) are as follows: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.  *AT&T Universal Card Serv., Inc. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001).  These elements generally correspond with those necessary to prove common law fraud under Texas law.

It must be noted that, as a written statement reflecting an insider's—Estrella Ventures— financial condition, the September income statement cannot be the basis of a § 523(a)(2)(A)

exception to discharge.  Exceptions to discharge based on a written financial statement fall under § 523(a)(2)(B).  The Court dismissed Plaintiffs' § 523(a)(2)(B) claim as presented in their Second Amended Complaint on January 26, 2015.  Accordingly, the § 523(a)(2)(A) claim must be based on more than the September income statement.

As set forth above, Saenz's representation that he worked for Pizza Patrón and could secure a franchise for Gomez proximately caused Gomez's injury.  Saenz made a representation which he knew was false.  He made the representation to induce Gomez to purchase the restaurant while at the same time maintaining his ability to reopen his own restaurant should things go poorly.  Gomez relied on the representation because he had failed to obtain a franchise directly from Pizza Patrón.  The reliance was justified because Gomez had no reason to doubt Saenz.[20]  Gomez first heard that Saenz worked for Pizza Patrón corporate from Ortiz, Gomez's childhood friend and himself a manager of a Pizza Patrón.  Saenz, Ortiz's brother-in-law and the owner of at least four Pizza Patrón franchises, then confirmed Ortiz's story.  Gomez sustained a loss as a proximate result of the representation when the restaurant failed.  Without the representation, Gomez would not have entered into the transaction.  The injury was a foreseeable result of Saenz's representation to Gomez.

Plaintiffs have met all elements of § 523(a)(2)(A).  Section 523(a)(2)(A) "prevents the discharge of all liability *arising* from fraud."  *Cohen v. de la Cruz*, 523 U.S. 213, 215 (1998) (emphasis added).  "[A]ny liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor" is excepted from discharge.  *Id.* at 223.  The debt excepted from discharge includes exemplary damages as well as the actual damages from Defendants' fraud.

---

[20] Section 523(a)(2)(A) requires only that a plaintiff's reliance be justified, which is a lesser standard than reasonable reliance.  *Field v. Mans*, 516 U.S. 59, 116 (1995).

The total amount excepted from discharge under § 523(a)(2)(A) is $412,500.00.   This figure is the sum of the actual damages ($330,000.00) plus exemplary damages ($82,500.00).

### Conclusion

The Court will issue a separate Judgment consistent with this Memorandum Opinion.

SIGNED **July 22, 2015.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE